**Muhamad NUDIR, Petitioner**

v.

**ATTORNEY GENERAL OF the UNITED STATES.**

No. 08–3526.

United States Court of Appeals, Third Circuit.

Submitted Pursuant to Third Circuit LAR 34.1(a) Dec. 8, 2009.

Opinion filed: Jan. 12, 2010.

William A. Hahn, Esq., Hahn & Matkov, Boston, MA, for Petitioner.

Aliza B. Alyeshmerni, Esq., Richard M. Evans, Esq., Paul Fiorino, Esq., Thomas W. Hussey, Esq., United States Department of Justice, Office of Immigration Litigation, Washington, DC, for Respondent.

Before: FUENTES, ROTH and VAN ANTWERPEN, Circuit Judges.

## OPINION

PER CURIAM.

Muhamad Nudir, a native and citizen of Indonesia, was admitted to the United States in 1998 as a non-immigrant visitor authorized to stay in this country until January 22, 1999. He remained in the United States undetected until he was placed in removal proceedings under INA § 212(a)(1)(B) in 2003. Nudir conceded removability and applied for asylum, withholding of removal, and relief under the Convention Against Torture (CAT), claiming that he fled Indonesia because the military had forced him to transport residents of Aceh Province for torture and killing for an eight month period in 1991–1992. He feared that the military would kill him if he returned to Indonesia.

At the hearing, Nudir testified that he was from Aceh Province and that he lived there with his wife and children until 1992. According to Nudir, the military forced him to provide military transport in early 1991 because they forced all villagers with cars to drive for them. (AR 148–49; 152.) His job was to drive members of the military to various places in Aceh Province so that they could pick up villagers. (AR 140; 152–154.) Initially, he denied knowing what the military's motives were and what they were doing with the people they apprehended. (AR 136; 155.) He testified that he first realized that the military was torturing people when they directed him to pick up three of his friends on three consecutive nights in late 1991, and tortured them. (AR 138–139; 156.) Ultimately, he admitted that he was aware all along that the military was engaged in torture, but that there was nothing he could do about it. (AR 157.) He said that once his friends were tortured, "I couldn't hold my heart anymore." (AR 135–36.)

In 1992, soon after he saw his friends tortured, Nudir lied to the military that he needed to go to Medan to replace his broken down truck, and fled Aceh Province with his wife and children. (AR 157.) He worked odd jobs driving a truck in Medan and in Jakarta. He moved constantly to different addresses so that the military would not find him. (AR 189–90.) He left Indonesia in 1998 to attend a symposium in New York City at which he was invited to speak about human rights violations in Aceh Province. (AR 163.) He said that he feared that the military would harm him if he returned to Indonesia because he fled from them in 1992, and because the military knew that he participated in human rights demonstrations against atrocities in Aceh Province in the United States. (AR 160–63; 177; 182.) His wife and children, with whom he remains in regular contact, continue to live in Indonesia unharmed. (AR 191–92.)

As for his belief that the military would kill him because he fled Aceh Province against their wishes, Nudir's testimony about the death of another military transporter was contradictory. When asked whether he knew anyone who was killed by the military for refusing to obey their orders, he said "Yes, I saw it." (AR 146.)

He said that the transporter told the military that he could not drive for them because his children were sick, but that the military did not listen. (AR at 146–47.) When asked why the military shot the man, however, he answered that "all I know your honor is that I saw many bodies in the street." (AR 147.) As for when the military transporter was killed, Nudir first said that "[i]t was around 1992 and I work for military eight months." (AR 149.) A few questions later, he reiterated that "[t]his happened in 1992." (*Id.*) When asked whether the man was killed before Nudir became a driver, however, Nudir responded "[b]efore I became a driver it was the story in [the] next village. After that happened in the next village, of course all the news we heard in our village." (AR 150.) When asked "[w]as he killed by the military before you began working for them or after?" he said, "[b]efore I was working for the military." (*Id.*)

In addition to his asylum application, which lacked detail and contained no affidavit or personal statement, Nudir also submitted a letter inviting him by name to a human rights conference in New York City in 1998, the State Department's 2004 Country Report for Indonesia, the 2005 Amnesty International Report, his birth certificate, his marriage certificate, a news report on Indonesia's human rights network, and undated photos of Nudir appearing in demonstrations.

The IJ denied Nudir's asylum application as time-barred and determined that he failed to show his eligibility for an exemption from the one-year deadline. The IJ also denied asylum, withholding of removal, and CAT relief, based on Nudir's lack of credibility and his failure to provide reasonably available corroboration from his wife. Moreover, the IJ concluded that Nudir assisted in the persecution of others, and thus, he was barred by statute from obtaining asylum or withholding of removal.

The BIA upheld the denial of Nudir's asylum application as time-barred, noting that Nudir failed to challenge the IJ's findings as to the time-bar and as to his failure to demonstrate that he qualified for an exemption from the one-year deadline. The Board concluded that, in any event, Nudir's asylum application was time-barred based on the information contained in the application.[1] The Board found no clear error in the IJ's adverse credibility determination and it agreed with the IJ's conclusion that Nudir failed to provide sufficient corroborating evidence of his claims for relief. The BIA declined to address Nudir's ineligibility for asylum or withholding of removal as someone who assisted in the persecution of others on account of a protected ground. Nudir filed a timely petition for review.

We will deny the petition. We have jurisdiction under 8 U.S.C. § 1252(a)(1) to review the final order of the BIA denying Nudir's request for asylum, withholding of removal and for CAT relief. When, as here, the BIA substantially relies on the IJ's adverse credibility determination, the Court reviews the decisions of both the IJ and the BIA. *Chen v. Ashcroft*, 376 F.3d 215, 222 (3d Cir.2004). Whether the BIA applied the appropriate standard of review is a question of law, and is therefore subject to *de novo* review. *See Wang v. Ashcroft*, 368 F.3d 347, 349 (3d Cir.2004). We

---

1. Nudir claims that the BIA failed to consider the arguments he raised in his BIA brief demonstrating that he qualified for an exemption from the one-year limitations period. It appears that the BIA did overlook these arguments. We note, however, that the BIA ruled

alternatively that the IJ's denial of asylum and other relief based on Nudir's lack of credibility and on his failure to provide reasonably available corroboration was not clearly erroneous. (*See* IJ Op. at 18–19; BIA Op. at 2–3.)

review the factual findings of the IJ, including adverse credibility findings, for substantial evidence. *Abdulrahman v. Ashcroft,* 330 F.3d 587, 597 (3d Cir.2003). The IJ's adverse credibility finding must be upheld unless "any reasonable adjudicator would be compelled to conclude to the contrary." *Xie v. Ashcroft,* 359 F.3d 239, 243 (3d Cir.2004). "In making a credibility determination, the IJ must provide 'specific, cogent reasons[s]' why the applicant is not credible." *Gabuniya v. Attorney General,* 463 F.3d 316, 321 (3d Cir.2006) (citation omitted).

Nudir's primary claim is that § 101(a)(3) of the REAL ID Act does not apply to him because he filed his asylum application in 2003, well before the REAL ID Act was enacted. He maintains that the IJ's adverse credibility determination is erroneous under the pre-REAL ID Act standard, as any inconsistencies in his testimony did not go to the heart of his claim. The Government counters that Nudir filed his asylum application in 2006, and, thus, he is subject to the credibility standard set forth in § 101(a)(3). Under § 101(a)(3), the trier of fact may consider *any* inconsistency, inaccuracy or falsehood in an asylum applicant's written or oral statements, "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." *Gabuniya,* 463 F.3d at 322 n. 7. We need not decide which standard should have applied because we conclude that the credibility determination was proper under the more generous pre-REAL ID Act standard.

The IJ noted several inconsistencies in Nudir's testimony which called his credibility into question. Many of these discrepancies pertained to the question of whether Nudir was barred from obtaining withholding of removal based on his role in assisting the Indonesian military in the persecution of Aceh villagers, a ground that the BIA specifically declined to address. Another inconsistency noted by the IJ could be viewed as minor. In that instance, the IJ highlighted the discrepancy in Nudir's testimony regarding whether he traveled alone in his truck or whether the military rode with him. As the Board correctly pointed out, however, Nudir provided a reasonable explanation for the discrepancy, stating that he drove in the cab while the military rode in the truck bed. (*See* BIA Op. at 2 n. 1.)

The remaining inconsistency, Nudir's changing testimony concerning the murder of another military transporter, is especially significant as it bears directly on his fear that he would be persecuted for having fled the military in 1992. According to Nudir, the murder of a fellow transporter made him fear that the military would kill him too. Initially, Nudir said that he actually saw the military kill the transporter in 1992, almost eight months after he began working. On repeated questioning, however, he changed his earlier testimony, stating that the murder had occurred *before* he started driving for the military in early 1991, and that he had only heard through the informal village grapevine about a killing in another village. Based on this discrepancy, no reasonable adjudicator would be compelled to find Nudir's testimony credible. *See Xie,* 359 F.3d at 243; *see also Tarrawally v. Ashcroft,* 338 F.3d 180, 187 (3d Cir.2003) (holding that an adverse credibility determination is supported by substantial evidence even where only some of the stated bases are appropriate). Because the IJ gave specific, cogent reasons for disbelieving Nudir, which the Board adopted, we must uphold the adverse credibility determination. 8 U.S.C. § 1252(b)(4)(B).

Nudir next claims that the IJ and the BIA erred when they determined that he failed to provide necessary corroboration. Corroboration goes to the sufficiency of

the evidence; thus, it requires analysis independent of an adverse credibility determination. *See Chen v. Gonzales,* 434 F.3d 212, 221 (3d Cir.2005). A credible applicant for asylum and other relief may be required to supply corroborating evidence to meet his burden of proof. *Id.* at 218. Here, Nudir testified that he was frequently in contact with his wife in Indonesia, who could have confirmed his account of the incidents that occurred in Aceh Province from 1991–1992.[2] His only explanation for failing to provide his wife's affidavit is that he did not know that he needed it. Based on the record, we cannot say that the IJ or the BIA erred in determining that the claim lacked necessary corroboration. Nudir had an abundance of time (from 1998 through 2006) to obtain reasonably available corroboration. It appears that Nudir blames his immigration attorney for failing to supplement his asylum application with his personal statement and for failing to advise him about the need for corroboration. (*See* Petitioner's Brief, at 20–21.) To the extent that he raises ineffectiveness of immigration counsel in his petition for review, we cannot address it because Nudir failed to raise the claim before the IJ or the BIA and the BIA did not address the issue *sua sponte* on its merits. *Lin v. Attorney General,* 543 F.3d 114, 121–23 (3d Cir.2008).

Because we have determined that substantial evidence supports the adverse credibility and lack of available corroboration findings, and because Nudir has not cited to evidence indicating that he might be tortured for reasons unrelated to his claims for asylum and withholding of removal, we will uphold the BIA's decision to deny the CAT claim. *See Ezeagwu v. Mukasey,* 537 F.3d 836, 840 (8th Cir.2008).

We have thoroughly reviewed Nudir's remaining claims presented for our review and conclude that they are meritless. Accordingly, we will deny the petition for review.

---

**2.** According to Nudir, his wife had received several anonymous phone calls asking for his whereabouts as recently as May 2006. There is no evidence, however, that the military made these phone calls.